IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :
                                  :
            v.                    :    Case 01-CR-258
                                  :
DAVID MIZIC,                      :
        Defendant                 :

TRANSCRIPT OF PROCEEDINGSF

SENTENCING

BEFORE:    HON. SYLVIA H. RAMBO, Judge

DATE:      August 16, 2002

PLACE:     Courtroom Number Three
           Federal Building
           Harrisburg, Pennsylvania

COUNSEL PRESENT:

WILLIAM BEHE, Assistant United States Attorney
    For - United States of America

JAMES WEST, Esquire
    For - Defendant

Vicki L. Fox, RMR
Official Reporter

2

I N D E X

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| 1. Andrew Katerman | | | | |
| By Mr. West | 3 | -- | -- | -- |
| By Mr. Behe | -- | 8 | -- | -- |
| | | | | |
| 2. Angela Gallardo | | | | |
| By Mr. West | 9 | -- | -- | -- |
| By Mr. Behe | -- | 14 | -- | -- |

Direct Exam./West - Andrew Katerman                3

1      THE COURT:  Good morning.

2      MR. WEST:  Good morning, Your Honor.

3      MR. BEHE:  Good morning, Your Honor.  Your Honor,

4  this is the matter of the United States of America versus

5  David Mizic at Criminal Docket Number 01-258.

6      Mr. Mizic is present in court with Mr. West, his

7  counsel.  Now is the time and place set for sentencing in

8  this matter.  Both parties were able to review the revised

9  presentence investigation report.  Mr. West has by way of

10  letter made certain objections to that revised report.

11      Do you want us to approach, or should we stay

12  here?

13      THE COURT:  I understand you have some witnesses?

14      MR. WEST:  I have some very short witnesses, Your

15  Honor, that will be right to the point I believe.

16      THE COURT:  Are they here?

17      MR. WEST:  Yes.  One is here, and one is on the

18  way.  The one has a small child, and the child needs changed

19  so she will be here shortly.  I could call Mr. Katerman, who

20  is the Postal Inspector first.

21      Mr. Katerman, will you take the oath, sir?

22

23      ANDREW KATERMAN, called as a witness, being duly

24  sworn, testified as follows:

25

Direct Exam./West - Andrew Katerman          4

1          THE CLERK:  Please state your name for the record

2    and spell your first and last name.

3    A       Andrew Katerman, A-n-d-r-e-w- K-a-t-e-r-m-a-n.

4                        DIRECT EXAMINATION

5    BY MR. WEST:

6    Q       Mr. Katerman, by whom are you employed?

7    A       I am a United States Postal Inspector.

8    Q       Four how long?

9    A       13 years.

10   Q       In what capacity?

11   A       I am a field agent.  I investigate mail theft

12   basically in Central Pennsylvania.

13   Q       And you done that for approximately 13 years?

14   A       Yes, sir.

15   Q       Do you know the defendant in this case David Mizic?

16   A       Yes, sir; I do.

17   Q       Could you tell the Court briefly how you know David

18   Mizic?

19   A       I arrested David Mizic when he was sentenced in about

20   '92 I believe it was.  He was arrested in like '88 for theft

21   of mail, bank fraud, I think conspiracy charges.

22   Q       Did he cooperate at the time of his arrest?

23   A       Yes.

24   Q       Now do you know his brother John Mizic?

25   A       Yes, I do.

Direct Exam./West - Andrew Katerman                5

1    Q    Did you follow David and John after you arrested them

2    in 1988?

3    A    Yes.  John Mizic returned to his criminal ways and has

4    been arrested I believe three other times in Federal Court.

5    Q    For theft of mail?

6    A    Theft of mail, bank fraud and conspiracy charges, but

7    David straightened himself after that arrest.  I would

8    contact David routinely when I was looking for John, and he

9    would provide me with information, he had spoken to John two

10   or three days ago, he said he was in Pottstown, or he said

11   he was in Schuylkill Haven or wherever he was.

12         He would tell me -- he never went so far as to

13   set up a meeting, but he certainly did provide me with the

14   information he knew about John.

15   Q    Did you request that he ask his brother John to

16   surrender?

17   A    Yes.  He normally did that of his own accord I would

18   say.

19   Q    Would he tell you that he asked his brother to

20   surrender?

21   A    Yes, he would.

22   Q    During the course of John being a fugitive, how many

23   times did you contact David to seek his assistance?

24   A    My best estimate is more than six and probably less

25   than 20.

Direct Exam./West - Andrew Katerman                6

1    Q    Somewhere between six and twenty?

2    A    Yes, sir.

3    Q    In 1998, did it come to your attention that John Mizic

4    had again become a fugitive?

5    A    Yes.

6    Q    Did you contact David Mizic?

7    A    Yes, I did.

8    Q    And what occurred at that time that you contacted

9    David Mizic?

10   A    I was looking for John as I was all the previous

11   times, and David was providing me with the information that

12   he knew two or three days ago, he was in a hotel in this

13   town.  Then eventually, John was arrested in the state of

14   New Jersey.  I can't tell you where.  I don't recall.

15        But he was arrested in the state of New Jersey.

16   He was basically on a balcony of a hotel room.  He was so

17   high they arrested him for his own safety.  The EMT's came.

18   He was yelling and screaming.  And then they took him into

19   custody for his own safety.

20        David called me and told me that John had been

21   arrested but used the name David Mizic.  He gave me the name

22   of the prison.  I called the prison and verified that they

23   had someone in custody by the name of David Mizic.  I told

24   them that it was in fact John Mizic.

25        They checked the fingerprints, and they decided

Direct Exam./West - Andrew Katerman                    7

1    that it was in fact John Mizic.

2    Q     Is that how the federal warrants were executed for

3    John Mizic in New Jersey because of that information that

4    you provided?

5    A     To the best of my recollection, that is how the

6    Marshals became aware that John Mizic was in prison in New

7    Jersey, yes.

8    Q     When John Mizic again became a fugitive in the last

9    year or so, I believe it is your belief that he is presently

10   stealing mail out in Western Pennsylvania?

11   A     That's correct, in the Western District of

12   Pennsylvania.

13   Q     Did you do anything to contact David to seek his

14   assistance?

15   A     I attempted to contact David.  However, he no longer

16   has the same telephone number and I was unsuccessful.  But I

17   did attempt to contact David less than six months ago.

18   Q     Did you give any leads to the Marshal's Service when

19   they were attempting to locate John Mizic as to how you

20   would go about attempting to locate him?

21   A     I believe I said something to the effect that I had

22   talked to David Mizic in the past to find where John Mizic

23   was.

24   Q     How many people have you arrested in your career as a

25   Postal Inspector?

Cross Exam./Behe - Andrew Katerman                    8

1    A    More than 300.

2    Q    How would you rank John -- David Mizic -- strike the

3    John, please.  How would you rank David Mizic insofar as his

4    cooperation with you upon arrest?

5    A    I would say he was in the top five of the cooperative

6    people.  He readily admitted his guilt, helped identify

7    victims, identified banks, identified people that he stole

8    mail from, told me people's names.  He was certainly -- he

9    was cooperative when he spoke with me.

10                MR. BEHE:  I have no further questions.  Thank

11   you.  Mr. Behe.

12                THE COURT:  Cross-examine.

13                          CROSS-EXAMINATION

14   BY MR. BEHE:

15   Q    Agent Katerman, John Mizic escaped from a halfway

16   house in Harrisburg in May of 2001.  Are you familiar with

17   that?

18   A    Yes.

19   Q    Your testimony is that with regards to that escape and

20   David Mizic's conduct that was criminal, that he pled guilty

21   to here, that he did not provide you any assistance or

22   cooperation in that matter with regards to trying to find

23   his brother?

24   A    I have not spoken with David Mizic since May of 2001,

25   that's correct.

Cross Exam./Behe — Andrew Katerman                    9

1    Q    So he has provided you nothing with regards to that?

2    A    Absolutely.

3    Q    Everything you are talking about was --

4    A    Prior.

5    Q    -- prior to '98, etcetera?

6    A    Yes.

7              MR. BEHE:  Thank you.  That is all I have.

8              THE COURT:  Redirect?

9              MR. WEST:  None.  May this witness be excused?

10             THE COURT:  Yes.  You are excused.

11   A    Thank you, Your Honor.

12             MR. WEST:  Your Honor, my next witness had an

13   accident with her child.  She has got a child less than one

14   years old.  My secretary was helping her change the diaper

15   when I left the office.  My secretary is under instructions

16   to bring her right down here.

17             THE COURT:  We can take a recess until then.

18             MR. WEST:  It should be momentarily.  I

19   appreciate the Court's indulgence.

20             (A recess was taken.)

21                          AFTER RECESS

22             MR. BEHE:  Thank you for your taking the recess,

23   Your Honor.  I apologize.

24             THE COURT:  No problem.

25             MR. WEST:  Angela Gallardo.

Direct Exam./West - Angela Gallardo                10

1      ANGELA GALLARDO, called as a witness, being duly

2  sworn, testified as follows:

3      THE CLERK:  Would you please state your full name

4  and spell your first and last name for the record?

5  A     Angela Gallardo, A-n-g-e-l-a G-a-l-l-a-r-d-o.

6  BY MR. WEST:

7  Q     It is Mrs. Gallardo?

8  A     Gallardo.

9  Q     Okay.  And is that your baby and your friend in the

10  back of the room?

11  A     Yes.

12  Q     That was the reason you were a little late in getting

13  here; is that correct?

14  A     Yes.

15  Q     You have driven here from where today?

16  A     From Pottstown, Pennsylvania.

17  Q     Is that Pottstown in Montgomery County as opposed to

18  Pottsville in Schuylkill County?

19  A     Correct.

20  Q     Are you related to the defendant in this case?

21  A     Yes.  He is my father.

22  Q     And I just have a few questions.  Are you familiar

23  with your uncle John Mizic becoming a fugitive?

24  A     Yes.

25  Q     How are you familiar with that?

Direct Exam./West - Angela Gallardo                    11

1    A    Through my father and through Uncle John calling.

2    Q    Now are you aware as to whether or not John Mizic

3    contacts your father?

4    A    No longer he doesn't.  When he first became a fugitive

5    again, he did.

6    Q    How would he contact him?

7    A    Through his cellphone.

8    Q    In other words, John Mizic would call your father on

9    his cellphone?

10   A    Yes.

11   Q    Have you ever heard your father attempt to talk John

12   into surrendering?

13   A    Yes, I did.

14   Q    Could you tell us the facts surrounding that?

15   A    I remember he was telling him -- he was telling him

16   not to be stupid.  He only had two weeks to go in a halfway

17   house, not to mess things up now when he was so close to the

18   end.

19        I remember he did offer him some money.  He said

20   just take it, and don't commit a crime.  Think about what

21   you are doing here.  Take a little vacation and turn

22   yourself in.

23   Q    Did your father give you any reason why he gave John

24   money after he walked away from the halfway house?

25   A    Because he didn't want him to go commit another crime.

Direct Exam./West - Angela Gallardo                    12

1    Q     Were you present when the Marshals came to interview

2    your father?

3    A     Yes, I was.

4    Q     Was that at your house?

5    A     Yes.

6    Q     Could you tell the Court what occurred there?

7    A     I was downstairs.  U.S. Marshals knocked on the door.

8    I answered the door.  I called my dad down.  He was

9    upstairs.  They came in.  They just started asking him

10   questions about my Uncle John and everything.

11   Q     Let me ask you this:  Was your dad truthful with them?

12   A     Yes, he was.  In fact, the U.S. Marshal said we did

13   come here to arrest you, but since you were honest with us,

14   we won't.

15   Q     What did your father truthfully tell the Marshals in

16   their opinion?

17   A     He told them that he was cleaning out John and Karen's

18   house trying to get some things together to take to Karen's

19   mother.  They said that was a good idea.  In fact, he should

20   hurry up and do it before they had to close up the house

21   because they didn't want to see the kids lose everything.

22   Q     You mean the landlord would put a lock on the house?

23   A     I guess that is what they meant, the landlord.  I

24   don't know who they meant would put a lock on the house.

25   They didn't want the kids to lose everything, too.

Direct Exam./West – Angela Gallardo                13

1    Q    Continue.  What else occurred that day?

2    A    My dad told them that he did take the car back for my

3    Uncle John.

4    Q    The rental car?

5    A    Yes, rather than letting it sit and be stolen.  I

6    believe he did tell them about giving him the money so he

7    wouldn't leave.

8         He told him that in the past he did turn my Uncle

9    in, but that he was not going to set him up this time.

10   Q    Is that your father's words I will not set him up?

11   A    Yes.  He said he wasn't going to set him up.  That is

12   what they wanted him to do.

13   Q    Did he agree that he would try to urge him to

14   surrender?

15   A    Yes, he did.  He said he'll talk to John, try to talk

16   him into turning himself in because he didn't want to see

17   things get ugly for the kid's safety and for their safety.

18   Q    I believe you have recently lost your mother?

19   A    Yes.

20   Q    Was that a long illness?

21   A    Yes.

22   Q    Was your father a caregiver during that illness?

23   A    Yes.

24   Q    How long did the illness last?

25   A    I am sorry?

Cross Exam./Behe - Angela Gallardo                14

1    Q     How long did the illness last?

2    A     Probably since I was in sixth grade.  That's when it

3    got really bad.  She had diabetes all my life, but that is

4    when it started to turn.

5    Q     How long was she wheelchair bound?

6    A     I would say for the last two years of her life.

7    Q     Was she bedridden at any point?

8    A     Yes, she had a hospital bed in our house and

9    everything.

10   Q     Would your father take the majority of the care of

11   your dying mother?

12   A     Yes, my dad would bathe her, empty her potty because

13   she couldn't walk more than a couple of feet, pick her up

14   and take her to and from dialysis.  He would give her her

15   medication, give her her IV, everything.  She had a medical

16   port in her chest.  He took care of that.

17              MR. WEST:  Those are all the questions I have.

18   Thank you.

19              THE COURT:  Cross.

20                      CROSS-EXAMINATION

21   BY MR. BEHE:

22   Q     Ma'am, I believe that you said that the explanation

23   offered by your father to the United States Marshals for

24   meeting your Uncle John in a parking lot to take the rental

25   car back to a storage facility was because he didn't want

Cross Exam./Behe – Angela Gallardo                    15

1   somebody to steal it?

2   A    No, he didn't want it to be stolen.  He wanted to make

3   sure the rental car got back to the proper place rather than

4   just letting it sit.  And then that would be another thing

5   against my Uncle John.

6   Q    He didn't say anything like the Marshals said he did

7   that he returned it so that his brother, your Uncle John,

8   wouldn't get caught when he was returning the rental car?

9   A    Not that I am aware of.  I was sitting two feet from

10  him.  I didn't hear the words so he wouldn't get caught.  I

11  didn't hear those words at all.

12              MR. BEHE:  All right.  That is all I have.

13              THE COURT:  You may step down.  Any other

14  witnesses?

15              MR. WEST:  No, Your Honor.

16              THE COURT:  Approach then.

17              MR. WEST:  I would only ask one other thing.

18  There was a letter that was written by Mr. Mizic, if it

19  could be just filed with the presentence report under seal

20  as an exhibit.  He has specifically asked me to file that as

21  his reasons for not appearing.

22              THE COURT:  Is that the one he wrote to me?

23              MR. WEST:  Yes.  That is the one he wrote to the

24  Court, Your Honor.  I do have a copy of it that was faxed to

25  me.  I don't know the quality of it.

Cross Exam./Behe - Angela Gallardo                16

1          I would just request, not as a court record, but

2     it as something that would go as an addendum to the

3     presentence report and is a sealed attachment to the

4     presentence report.

5               THE COURT:  It's already filed as of record.

6               MR. WEST:  I am sorry.  I didn't know that, Your

7     Honor.

8               THE COURT:  I think it went to the Clerk's Office

9     because they have it in the file Harrisburg, July 31, Mary

10    D'Andrea, Clerk by -- I don't know who did it as Deputy

11    Clerk.

12              MR. WEST:  That is all I wanted, Your Honor.

13    Mr. Mizic requested that I see that that record be on the

14    record, and that is all.

15              THE COURT:  Okay.  Lori, I want to give you the

16    original.  Put that with the original.

17              Mr. West, you have two basic objections here.

18    One is adjustment for acceptance of responsibility and

19    adjustment for obstruction of justice.  Let's talk about the

20    first one, and that is acceptance of responsibility.

21              In that regard, I want you to be aware of the

22    fact that I had denied acceptance of responsibility where

23    between the time of the plea and the time of sentencing

24    there is continued drug use.  And I can't find the case, but

25    there is a case on that I have relied upon.

Cross Exam./Behe - Angela Gallardo                17

1          MR. WEST:  I think it is absolutely a factor.  I

2   did some research on the book I brought.  I didn't bring it

3   with me.  It is the Federal Sentencing Guidelines.  And I

4   believe under the obstruction of justice section, there is a

5   commentary note --

6          THE COURT:  Okay.

7          MR. WEST:  -- that says continued drug use is not

8   obstruction, but it may be considered by the Court as a

9   factor in determining whether to get acceptance of

10  responsibility.

11          I believe that the people that prepared the

12  Guidelines put that in specifically so that that can be

13  done.  I do believe there is a Third Circuit case that

14  upholds that.

15          But I turn to the fact that that is always

16  discretionary with the Court.  And I do believe that his

17  last two drug tests, which would be one on July 25th that he

18  took in Reading and the one he took here when he surrendered

19  here last Friday, have been negative.

20          Certainly nine must strain the patience of the

21  Court, but these were in the Eastern District.  I think

22  there are different standards there.  I know in the Middle

23  District, nine flunked drug tests are an awful lot.  I am

24  not arguing that it is not a factor to be taken into

25  consideration.

Cross Exam./Behe - Angela Gallardo                    18

1      But I am arguing, and it is sort of a mitigation

2  of what he has done because when you look at this, I am sort

3  of saying it is so outside the heartland, he should get

4  acceptance of responsibility.  He had a wife who died.  He

5  went back to drugs.  That was a shame on him, but he is not

6  here being sentenced for going back to drugs and going back

7  to methamphetamine.

8      He has cooperated.  He drew the line on his

9  cooperation at the level where I will not set my brother up,

10  but anything else I can do, including giving him sage advice

11  as to not to walk away from the halfway house, not to engage

12  in any additional criminal activity, after you do to

13  surrender yourself and make things go easy on you.

14      Over his fourteen years of remaining crime free,

15  he has been the government's best friend insofar as bringing

16  his brother in, bringing him in alive so that he hasn't hurt

17  himself with drugs, and helping the law enforcement

18  authorities to, if you will, rehabilitate his brother as he

19  himself rehabilitated himself from going to a life of crime

20  for the first half of his adult life, which basically

21  consisted of robbing mailboxes, which he was charged with

22  both at the state and federal level and sentenced to

23  significant periods of jail to 1987 until he stands here

24  today engaging in taking care of his sick wife, which you

25  have heard about today, and in other ways assisting the

Cross Exam./Behe - Angela Gallardo                19

1    government within the bounds of decency and reason insofar

2    as the government certainly is entitled to assistance under

3    those particular circumstances.

4          So I think that while Your Honor can put on the

5    scales the drug use -- and it certainly weighs heavily -- on

6    the other side of the scales goes the fact that there has

7    been this fourteen year hiatus in which he has done

8    constructive things under adverse circumstances.

9          He lost his 20 percent Vietnam Veteran disability

10   because of his drug use.  He has difficulty getting a job

11   because he hurt himself on the job.  That is documented.  He

12   needs a back operation which is probably going to be denied

13   to him under his workmen's compensation settlement if he is

14   incarcerated for any lengthy period of time.  I think he has

15   got eight months left on his civil settlement agreement on

16   his workmen's compensation case that they will provide him

17   medical aid.

18         So there are factors that the Court can consider

19   on the acceptance of responsibility aspect that are outside

20   the heartland, that are different factors than your normally

21   I aided and abetted the CEO of this company and hiding the

22   accounting, or hiding after he fled, after he was being

23   sought for being arrested.

24         He has walked the line.  He has tried to balance

25   his obligations between legal obligation and moral

Cross Exam./Behe - Angela Gallardo                    20

1  obligation.  And I think he erred.  There is no excuse for

2  providing money to someone who has walked away from a

3  halfway house or is about to walk away from a halfway house.

4  That is legal guilt.

5          I think it is an important concept of moral guilt

6  that -- I don't want to call it an unwritten law, but it's

7  something that can be thrown on the scales in making that

8  determination.  The Federal Courts have many cases where

9  people are legally guilty.

10          When I first started as an Assistant U.S.

11  Attorney, the Vietnam War was going on.  People were being

12  prosecuted for draft evasion and properly so.  But still

13  there is this legal versus moral guilt that I think this

14  Court can take into consideration in arriving at a decision

15  on this case.

16          THE COURT:  Do you want to address the

17  obstruction?

18          MR. WEST:  I believe the obstruction is strictly

19  based on one factor, which was his failure to appear.  And,

20  again, the commentary specifically says that failure to

21  appear is a basis for an obstruction count, as well as

22  escape and continued criminal activity.  But he uses the

23  word willfully.

24          We did have that out of this District go up

25  before the Third Circuit and cert. being denied.  I believe

Cross Exam./Behe - Angela Gallardo                21

1    it was the Bellatear (spelled phonetically) case.  And in

2    the Bellatear case, Mr. Bellatear on the eve of forfeitures

3    and on the eve of his guilty plea transferred to his wife a

4    very valuable piece of property which was going to compound

5    the forfeiture attorney in this District's job in forfeiting

6    that piece of property.

7            And the Circuit -- and I didn't agree with them

8    at that time, but I do agree with them this time.  The

9    Circuit said that under Skrews (spelled phonetically) v.

10   United States, when you are talking about intent, you are

11   talking about bad intent, evil intent.

12           And then they said something that is an

13   impossible burden for the prosecutor, but they said they

14   haven't proved that bad intent beyond the preponderance of

15   the evidence in this particular case.  And they said that it

16   was wrong to give Mr. Bellatear a two point upward departure

17   for obstruction of justice based on that conduct.

18           What I focus on there is the bad intent, evil

19   intent aspect.  This system unfortunately today survives

20   with the number of laws that Congress has passed based on

21   guilty pleas being processed.  I can remember a day when

22   trials were a very frequent occurrence on the criminal site

23   and the Courts were able to dispose of them in a very, very

24   deliberate and well thought out fashion.

25           But today, guilty pleas I think are really the

Cross Exam./Behe - Angela Gallardo                    22

1    life blood of the system going forward.  And it is a shame

2    that it has come out that way.  Every once in a while, one

3    is going to take a little more time than another.

4              THE COURT:  Are you aware of the fact that this

5    is the second time he did not show?

6              MR. WEST:  No.

7              THE COURT:  He was supposed to appear on

8    January 24th, 2002 and did not, and we had to reschedule it

9    for February.

10             MR. WEST:  The failure to appear on January --

11             THE COURT:  For the plea.  There was a

12   January 24, 2002 9:30 AM change of plea.  He didn't show.

13   We had to reschedule it.

14             THE DEFENDANT:  Your Honor?

15             THE COURT:  Yes, sir.

16             THE DEFENDANT:  I had notified the U.S.

17   Attorney's Office in advance that it was going to be

18   difficult for me to make that, and they said that they would

19   reschedule it.

20             MR. WEST:  I talked to him about this.  I know he

21   had lost his driver's license.

22             THE DEFENDANT:  I had spoken to them beforehand

23   about that.  He told me that it would be rescheduled.  I

24   don't think there was ever a warrant put out for me.

25             MR. WEST:  Who did you talk to?

Cross Exam./Behe - Angela Gallardo                23

1          THE DEFENDANT:  I talked to Mr. Kluz to the U.S.

2     Attorney's Office.

3          MR. WEST:  You didn't talk to the U.S. Attorney's

4     Office?

5          THE DEFENDANT:  No.  There was never a warrant

6     put out for me; was there?

7          THE COURT:  There wasn't a warrant put out for

8     you this last time either; was there?

9          THE DEFENDANT:  Yes, there was.

10         MR. WEST:  July 31st, there was a warrant.

11         THE DEFENDANT:  I had spoken to my attorney well

12    in advance of that date, that it was going to be difficult

13    because of some medical problems that I was having.

14         THE COURT:  Did you make this statement to either

15    the U.S. Attorney or Mr. Kluz that if you wanted me there in

16    court, you are going to have to send an ambulance for me?

17         THE DEFENDANT:  I might have said something like

18    that.  Yes, I might have said something like that.  At the

19    time, I couldn't even get out of bed, Your Honor.

20         THE COURT:  All right.

21         MR. WEST:  I will speak briefly and conclude on

22    the obstruction part.  Sometimes, some of the pleas are

23    going to take longer than others.  But I think it is very

24    important that the Defendant feel that he has been heard,

25    that his arguments about Miranda, his arguments about

Cross Exam./Behe - Angela Gallardo                24

1    withdrawing the plea, his arguments about factual statements

2    in the presentence report are listened to and are evaluated,

3    and a decision made as to what is the appropriate course to

4    proceed.

5              When I first met the defendant, he wanted to

6    withdraw his plea.  He was adamant.  We discussed it for a

7    long time.  And he took my advice.  That it is the best

8    thing to go forward with this plea under the facts and

9    circumstances of this particular case.

10             Am I correct on that?

11             THE DEFENDANT:  Yes, you are.

12             MR. WEST:  But it took patience and time and

13   reasoning with him to get him here in the position that he

14   is in.  And there is no doubt in my mind it is the best

15   position for him to be in today.  And he has to take my word

16   as his attorney for that.

17             I don't think he had any evil intent.  I think

18   that he was to some extent -- and he would deny this --

19   afraid of what was going to happen and was not attempting to

20   show any contempt towards the Court.

21             I think the factors in his letter are factors

22   that did motivate him.  He is very remote from the Court.

23   He was remote from his appointed counsel.  And it was tough

24   for him to communicate with his appointed counsel.

25             And I think that the fact that even after not

Cross Exam./Behe - Angela Gallardo                25

1    appearing, he realized as he has told his brother over the

2    last fourteen years, you have to appear here.  You have to

3    take your medicine.  It will go easier on you.

4              He knew those things and stayed in touch with the

5    Probation Officer Mrs. Baker.  He stayed in touch with the

6    Court by mail, stayed in touch with his counsel and stayed

7    in touch with me when I was appointed and did appear here.

8              I know there is discretion on this, but to me, it

9    is at the low end, that it shouldn't be something that takes

10   him from zero to six to two to eight.  And that would be my

11   presentation on that -- or my argument on that, Your Honor.

12             THE COURT:  Do you wish to speak on your own

13   behalf?

14             THE DEFENDANT:  Yes, Your Honor.  Concerning the

15   matter with the Mr. Kluz and I, who really never saw eye to

16   eye, I am sorry that I didn't appear when I was scheduled to

17   appear, but Mr. Kluz -- all I wanted him to do was represent

18   me as Mr. West has.  I didn't get any representation from

19   him.

20             All I wanted was somebody to represent me, you

21   know.  And that's why I delayed my surrender.  It had

22   nothing to do, believe me, with any disrespect for the

23   Court.

24             THE COURT:  Mr. Behe?

25             MR. BEHE:  Yes, Your Honor.  Since everybody has

Cross Exam./Behe - Angela Gallardo                    26

1   concluded with the obstruction argument, I will address that

2   one first.

3           I believe that the obstruction enhancement on its

4   face could apply.  But as with everything else, Your Honor

5   has to consider someone's explanation as to whether or not

6   that will mitigate or satisfy the Court.  I should say that

7   the explanation is not reasonable, but perhaps acceptable

8   because it was the Court that was inconvenienced.

9           I am at the disadvantage because I don't have the

10  letter in front of me with all of the reasons and

11  explanations for it.  So I will defer to the Court on that.

12          I think the fact that the application notes to

13  that section specifically describe the situation where

14  somebody -- fails to appear and makes his case different

15  from Bellatear where they were wrestling with whether the

16  filing of a quick claim deed was something that impacted the

17  case or the instant offense.  But as I say, the fact that it

18  might technically be made out doesn't mean that Your Honor

19  has to blindly apply it.  It is the explanation offered by

20  the individual who didn't show up that Your Honor has to

21  consider.

22          With regard to acceptance of responsibility, I

23  kind of view that as another matter, an individual

24  repeatedly using drugs while they are at liberty, the Court

25  letting someone out with restrictions that allow them to

Cross Exam./Behe - Angela Gallardo                    27

1    remain free, and they go ahead and continue to use

2    controlled substances during that period of time, to me

3    shows that they just have not accepted responsibility.

4              I believe that the Defendant's comments to the

5    Probation Officer while, of course, showing not unexpectedly

6    a loyalty towards this family show him to be clearly

7    unrepentant to the extent he said I would do it again in

8    terms of providing money and support to his brother if this

9    situation arose.

10             So if Your Honor accepts the drug use alone, I

11   believe that would be enough to deny acceptance.  Whether

12   being unrepentant at the same time you plead guilty means

13   you don't accept responsibility, I suppose is a separate

14   matter.

15             If Your Honor looks at it in practical terms, if

16   you rule in Mr. Mizic's favor on all of these, he is at zero

17   to six.  If you rule against him, he is two to eight.  There

18   is a substantial overlap of the range there.

19             As a practical matter, if Your Honor is asking

20   for sentencing recommendation, I would respectfully request

21   that he be sentenced to a term of imprisonment of six

22   months.

23             THE COURT:  First of all, with regard to the

24   objections, I am going to stand by the Probation Officer's

25   disinclination to grant acceptance of responsibility.  I

Cross Exam./Behe - Angela Gallardo                28

1    have to be consistent with my position with regard to the

2    use of drugs while people are out on bail waiting

3    sentencing.  So I am not going to give you an adjustment for

4    acceptance of responsibility.

5              As far as the obstruction of justice, that's is

6    an offense that I am going to give him the benefit of the

7    doubt on that and delete adjustment for obstruction.

8              The very fact that he was in constant

9    communication with Ms. Baker, is evidence of his intent that

10   he would show up and he did show up and bring himself in so

11   that having to enforce the warrant did not become necessary.

12             In that regard, the Order is:  AND NOW this 16th

13   day of August, the year 2002, pursuant to the Sentencing

14   Reform Act of 1984, it is the judgment of the Court that the

15   Defendant David Mizic is hereby committed to the custody of

16   the Bureau of Prisons to be imprisoned for a term of six

17   months.

18             The Court finds that the Defendant does not have

19   the ability to pay a fine.  It is ordered that the Defendant

20   pay to the United States a special assessment of $100.00.

21   The assessment is due in full immediately and shall be paid

22   through the Clerk of Court.

23             The following statement of reasons is placed on

24   the record for the sentence that has been imposed:  The

25   Court adopts the factual findings and the Guideline

Cross Exam./Behe - Angela Gallardo                    29

1   application in the presentence report except that the

2   enhancement for obstruction is deleted, which changes the

3   total offense level to four and imprisonment range of zero

4   to six months.  The fine is waived because of the

5   Defendant's inability to pay.

6            The sentence is within the Guideline range.  That

7   range does not exceed 24 months, and the Court finds no

8   reason to depart from the sentence called for by the

9   application of the Guidelines.

10           Now, Mr. Mizic, you can appeal your conviction if

11   you believe that your guilty plea was somehow unlawful or

12   involuntary, or that there is some other fundamental defect

13   in these proceedings that was not waived by your guilty

14   plea.

15           You also have a statutory right to appeal your

16   sentence under certain circumstances, particularly if you

17   think this sentence is contrary to law.

18           You have ten days from this day in which to file

19   a notice of appeal.  Mr. West will continue to represent you

20   without cost to take an appeal should you desire to do so.

21           You may also request the Clerk of Court to

22   prepare and file a notice of appeal on your behalf.

23           Do I understand that you had a doctor's

24   appointment recently?

25           THE DEFENDANT:  Yes.  I was supposed to see a

Cross Exam./Behe – Angela Gallardo                    30

1    neurosurgeon today I think it was.

2              THE COURT:  Is that still available?

3              THE DEFENDANT:  No, I don't think so.

4              THE COURT:  Is your need for an operation

5    imminent?

6              THE DEFENDANT:  Well, actually, he was supposed

7    to decide.  It was going to be whatever -- my family doctor

8    had been urging me actually for the last eight months to see

9    him, but I hadn't had my workmen's compensation settled so

10   there was actually no responsibility for the medical bills.

11   So I hadn't seen him.  I just settled my workmen' comp.

12             THE COURT:  Well, my concern is, first of all as

13   far as his compensation paying for his operation, six months

14   -- he has eight months to go.  He has two months on that.

15   But at the same time, I need to know whether if it is

16   imminent whether he needs to be placed in a Bureau of

17   Prisons hospital.

18             MR. WEST:  Your appointment is gone; is that

19   correct?

20             THE DEFENDANT:  Yes.

21             MR. WEST:  You cancelled it?

22             THE DEFENDANT:  No, I was supposed to be there

23   today.

24             MR. WEST:  What time?

25             THE DEFENDANT:  This morning at 8:30.

Cross Exam./Behe - Angela Gallardo                    31

1    MR. WEST:  Mrs. Baker pointed out that the Bureau

2    of Prisons does have a facility.  I do know he needs to be

3    evaluated as to whether or not he needs an operation.  And

4    anything the Court can do --

5    THE COURT:  I can, but it is going to be

6    recommending a place that is not going to be in this area.

7    THE DEFENDANT:  Your Honor, I would rather pass

8    on that simply because, first of all, while incarcerated, my

9    workmen's comp. isn't going to cover it.

10    THE COURT:  Will they pick up on it after you are

11    released?

12    THE DEFENDANT:  Yes.  You have to consider

13    rehabilitation, all those things.  After one year, my

14    medical coverage stops dead on the day.  I get nothing.

15    Dead on the day, whether I am recovered or not.

16    If I get an operation the day before, they will

17    cover the operation.  But the day after, they won't cover

18    the medications.  I could fall into a real bad hole there if

19    something happens in the operation.

20    THE COURT:  Do you want a recommendation to be

21    placed in a prison hospital?

22    THE DEFENDANT:  No, Your Honor.  I would rather

23    not.  I would appreciate, Your Honor, if you would -- my

24    medications, I do need the medications.  The medications

25    help me, the pain medication.

Cross Exam./Behe - Angela Gallardo                    32

1          THE COURT:  You will get those.  You will be

2    evaluated.

3          THE DEFENDANT:  Fine.

4          THE COURT:  Will the medicines go with him?

5          THE DEFENDANT:  I have medicines at the County

6    Jail right now.

7          MR. WEST:  He brought them when he surrendered.

8          THE COURT:  They will take them from you.

9          THE DEFENDANT:  And administer them to me.

10         MR. WEST:  Your Honor, if I may, I am going to

11   meet with him and discuss this, but I may come back to the

12   Court and just ask like work release for just a day, that he

13   go to the doctor if we can resurrect that appointment, and

14   at least find out whether he needs this operation.

15         Because it could be -- under Your Honor's

16   sentence it could be right when he is released.  After six

17   months, he could get the operation.

18         THE COURT:  I don't know how long it is going to

19   take you to get an appointment for him.  I am going to keep

20   you in custody until you find out when the appointment is.

21         MR. WEST:  I will find out.  I will consult with

22   him, and I will report back to the Court as to what he

23   wants.

24         THE COURT:  Court is adjourned.

25         (Whereupon, the proceedings were concluded.)

33

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the trial of the above cause, and that this copy is a correct transcript of the same.

Vicki L. Fox, RMR

Official Reporter

The foregoing certification of this transcript does not apply to any reproduction by any means unless under the direct control and/or supervision of the certifying reporter.